UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PREZIO HEALTH INC., :
    Plaintiff, :
   :
v. : 3:13-cv-01463-WWE
   :
JOHN SCHENK and :
SPECTRUM SURGICAL INSTRUMENTS :
CORP., :
    Defendants. :

## MEMORANDUM OF DECISION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In this action, plaintiff Prezio Health Inc. alleges breach of contract and violation of Connecticut's Uniform Trade Secrets Act, Conn. Gen. Stat. § 35-50 *et seq*, against former employee, defendant John Schenk. Plaintiff also alleges tortious interference with contractual relations against Schenk's current employer, defendant Spectrum Surgical Instruments Corp. Defendants have filed a motion for summary judgment. For the following reasons, defendants' motion will be granted in part and denied in part.

## BACKGROUND

The parties' statements of facts and exhibits reveal the following factual background:

Plaintiff has multiple business units focused on suppling hospitals with (1) capital equipment and technicians; (2) handheld surgical instrument service; (3) endoscopic equipment; and (4) sterile processing department optimization.

Schenk began working as an hourly instrument repair technician for plaintiff's predecessor on or about July 7, 1998. Until 2013, Schenk primarily worked as a surgical instrument repair technician out of plaintiff's Michigan repair center. From approximately 2002 to 2003, Schenk worked as a mobile van technician in downtown Detroit, Michigan. During that

time, he serviced Detroit Medical Center ("DMC"). Starting in late 2011 or early 2012, Schenk served in a supervisory position as a senior lead technician, responsible for DMC. Schenk had access to Prezio's price file for DMC.

Defendants contend that Schenk's work was focused on instrument repair, but plaintiff responds that Schenk's role included costumer contact that provided sales opportunities.

In March 2011, Schenk executed an employment agreement with plaintiff.

The "Covenant Not to Compete" in the agreement provides, *inter alia*, that Schenk shall not:

(ii)   engage in, assist, perform services for, or provide consulting services to any other person, firm, corporation or other entity in the solicitation of or contract with, any customer, vendor, potential customer, or potential vendor of [Prezio] that was known in the performance of job duties with [Prezio] for the purpose of furnishing or during business with any such customer or vendor with regard to medical-surgical services, equipment or any other services or products distributed by or otherwise provided by [Prezio] and/or

(iii)  accept employment with, or service as a consultant, advisor, or act in [] any other capacity to any other person, firm, corporation or any entity that is in competition with [Prezio]

(vi)   solicit or engage in business transactions with any person, firm, corporation, joint venture or other business entity that was at any time during the prior two years before such solicitation or engagement, a customer of or vendor to [Prezio] or its affiliates.

In December 2012, Schenk relocated to Connecticut but continued to work for plaintiff. In June 2013, plaintiff transferred Schenk to the role of Regional Service Lead. In that position, Schenk was not involved in any high level business negotiations on behalf of plaintiff. However, while in Connecticut, Schenk helped Prezio perform a trial of its services for Bon Secours Hospital in Suffern, New York, as part of Prezio's attempt to secure a contract with Bon Secours.

Schenk resigned from plaintiff, effective August 30, 2013. A few weeks before his

departure, Schenk sent multiple Prezio documents to his private email address, including a ten page pricing list, a field contact list and territory map, a list detailing potential customer leads, and a chart of Prezio's sales contract review process.

Since 1983, defendant Spectrum has been providing a full line of surgical instrument care products, medical cleaning brushes and surgical instrument accessories. It is an industry leader for medical products, such as needle holders, surgical scissors, surgical forceps, as well as surgical instrument services and decontamination solutions. Spectrum offers a full range of surgical instrument repair services, from instrument sharpening and restoration to more advanced repairs. Spectrum serves hospitals, surgery centers and veterinary centers across the United States.

Hospitals that use contractors such as Spectrum or Prezio for instrument care generally use a single contractor per facility.

On September 7, 2013, Schenk began working for Spectrum as a Clinical Instrument Repair Consultant.

Spectrum asserts that it first learned of Schenk's non-compete agreement with Prezio in December 2013. However, Spectrum employees who hired Schenk testified at deposition that Schenk notified them of his non-compete with Prezio. Spectrum argues that when it learned about the non-compete, it limited Schenk's job responsibilities to avoid violating Schenk's agreement with Prezio. Plaintiff contends that Schenk's job duties were not materially limited.

Since beginning work at Spectrum, Schenk's work has almost entirely involved preexisting customers of Spectrum. Nevertheless, shortly after Schenk began working for Spectrum, Prezio lost the DMC account to Spectrum. Prezio also learned that it had not won the

Bon Secours account, which remained with TRE, a Spectrum affiliated company.  Prezio attributes these two setbacks to Schenk's breach of agreement and misappropriation; and to Spectrum's tortious interference.

## DISCUSSION

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute.  American International Group, Inc. v. London American International Corp., 664 F.2d 348, 351 (2d Cir. 1981).  In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate. Celotex Corp., 477 U.S. at 323.  If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. Anderson, 477 U.S. at 249.

**Count I - Breach of Non-Compete Agreement**

In Connecticut, the five factors to be considered in evaluating the reasonableness of a non-compete agreement are: (1) the length of time the restriction operates; (2) the geographical

area covered; (3) the fairness of the protection accorded to the employer; (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and (5) the extent of interference with the public's interests. Robert S. Weiss & Associates, Inc. v. Wiederlight, 208 Conn. 525, n. 2 (1988) "The five prong test is disjunctive, rather than conjunctive; a finding of unreasonableness in any one of the criteria is enough to render the covenant unenforceable." New Haven Tobacco Co., Inc. v. Perrelli, 18 Conn. App. 531, 534 (1989).

      Defendants argue that the geographical area in this case is unreasonable because the non-compete agreement at issue contains no geographical limitations. Such "global" restrictive covenants have been found reasonable when narrowly tailored to protect a company's business operations. Tyco healthcare Group LP v. Ross, 2011 WL 1790186, at *3 (D. Conn. May 10, 2011) (finding that because the employer was a worldwide manufacturer and distributor of surgical devices, the geographic restriction in the agreement was reasonable). Nevertheless, "a restrictive covenant must be confined to a geographic area that is reasonable in view of the particular situation." Perrelli, 18 Conn. App. at 534. In the instant case, there is no assertion that plaintiff operates on a global scale.

      Plaintiff responds that, "Given PREZIO's national reach it was reasonable for PREZIO to request of its employees their assent to a national covenant not to compete." Pl.'s Resp. at 11. Moreover, plaintiff contends that Spectrum also requires its employees to execute non-compete agreements without geographical limitations. The Court is not persuaded.

      Spectrum's non-compete agreements are not relevant to this case. Prezio's agreement is not a national covenant, as there is no language limiting coverage to the United States. The Connecticut Superior Court has held in a similar case that a geographic restriction of 150 miles

was reasonable given the highly specialized engineering maintenance services provided by the business and the location of its clients.  Maintenance Technologies Intern., LLC v. Vega, 2006 WL 279429, at *3 (Conn. Super. Ct.).  Nevertheless, in the instant case, there is no geographical restriction whatsoever, and "the language of a contract is typically construed most strongly against the party whose language it is and for whose benefit it was inserted."  Sturman v. Socha, 191 Conn. 1, 9 (1983).

> [B]ecause of their restrictive effect on trade in the free market, see *Deming v. Nationwide Mut. Ins. Co.*, 279 Conn. 745, 761 (2006), Connecticut courts have long recognized that non-compete covenants between employers and employees are subject to stricter review than other types of contracts, *see Samuel Stores, Inc., v. Abrams*, 94 Conn. 248, 253 (1919) ("Under the law, restrictive stipulations in agreements between employer and [employee] are not viewed with the same indulgence as such stipulations between a vendor and vendee of a business.... In a restrictive covenant between employer and [employee] ... there is small scope for the restraint of the right to labor and trade and a correspondingly small freedom of contract."). Therefore, as non-compete covenants "may be against public policy, ... [they] are enforceable only if their imposed restraint is reasonable." *Deming*, 279 Conn. at 761.

Saye v. Old Hill Partners, Inc., 478 F. Supp. 2d 248, 267 (D. Conn. 2007).

The Court will not strain itself in an effort to find the absence of a geographical area limitation to be a reasonable geographical area limitation.  For example, one could argue that a geographical area is implied to the extent that Schenk is only restricted from actually competing with Prezio, and therefore limited to Prezio's geographic footprint.  Such an argument would render reasonable-geographic-area requirements superfluous.  To the contrary, Connecticut and federal courts earnestly analyze the reasonableness of geographical area restrictions within non-compete agreements.  See Singas Famous Pizza Brands Corp v. New York Advertising LLC, 468 Fed. Appx. 43, 44 (2d Cir. 2012) (finding under New York law that restrictive covenants are

6

"rigorously examined" in terms of space or scope); AM Medica Communications Group v. Kilgallen, 90 Fed. Appx. 10, 11 (2d Cir. 2003) (finding under New York law that an employment restraint extending "anywhere in the world" to be unreasonable in geographic scope); A.H. Harris & Sons, Inc. v. Naso, 94 F. Supp. 3d 280, 293 (D. Conn. 2015) (finding a 100 mile radius to be reasonable and stating that "an anticompetition restriction will ordinarily require a geographical limitation in order to be reasonable.").

The Connecticut Supreme Court has held a specific clause barring an employee from soliciting the employee's accounts that existed when the employee left to have adequately fixed a geographic area limitation.  See Wiederlight 208 Conn. at 220 ("[T]he clause fixed the geographical scope of the covenant to a definite and limited area."); see also Drummond American LLC v. Share Corp., 2009 WL 3838800, *4 (D. Conn.) (finding that employee was not prevented from pursuing her occupation because "the covenant only prevents [the employee] from doing business with the 26 customers with whom she did business during her last year of her employment with [employer]."  Indeed, Connecticut courts distinguish between covenants that prevent the employee from transacting business with a specified group of former customers and "anticompetitive" covenants that restrict the employee from engaging in the same business with "all consumers of the service." Perrelli, 18 Conn. App. at 534.  The Connecticut Superior Court has held a two year covenant prohibiting a former employee's employment as a dance instructor within fifteen miles of the employer or within ten miles of any Fred Astaire Dance Studio to be unreasonably broad where it interfered with the instructor's ability to work in the free market.  RKR Dance Studios, Inc. v. Makawski, 2008 WL 4379579, *6-7 (Conn. Super. Ct.).  "The interests of the employee himself must also be protected, and a restrictive covenant is

unenforceable if by its terms the employee is precluded from pursuing his occupation and thus prevented from supporting himself and his family." Scott v. General Iron & Welding Co., Inc., 171 Conn. 132, 137 (1976).

In the instant case, Prezio's agreement bars Schenk from accepting employment with, serving as a consultant for, or acting in "any other capacity" with respect to "any other person, firm, corporation or any entity" that is in competition with Prezio. Schenk was not merely prohibited from soliciting Prezio's existing accounts, but also from interacting with *"potential"* costumers in virtually any capacity within the medical-surgical services and equipment industry. If the covenant were enforced, Schenk would essentially be prevented from pursuing his occupation. Given the nature of plaintiff's business, the unlimited geographical area covered by plaintiff's non-compete agreement is not reasonable, rendering the covenant unenforceable. Summary judgment will be granted as to Count I.

**Delayed Motion for Preliminary Injunction**

"A preliminary injunction is a procedural device designed to prevent future harm, see generally 13 Moore's Federal Practice § 65.02(2) (Matthew Bender 3d ed.1999), and is an extraordinary remedy which should not be granted unless the moving party has made a clear showing of entitlement to relief." Minnesota Mining and Mfg. Co. v. Francavilla, 191 F. Supp. 2d 270, 277 (D. Conn. 2002).

> "Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir.1995) (quoting *Citibank N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir.1985)). The term "irreparable harm" "means injury for which a monetary award cannot be adequate compensation." *Jayaraj*, 66 F.3d at 39 (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979)).

> Furthermore, "[t]he mere possibility of harm is not sufficient; the harm must be imminent and the movant must show it is likely to suffer the irreparable harm if the equitable relief is denied." *Hirschfeld v. Stone*, 193 F.R.D. 175, 185 (S.D.N.Y.2000).

Fracavilla, 191 F. Supp. 2d at 277.

Schenk has now worked for Spectrum for well over two years. Nevertheless, twenty-one months after filing the instant case, on the dispositive motion deadline, plaintiff filed a motion for preliminary injunction to enjoin Schenk from working for Spectrum and to prevent the disclosure of trade secrets. Plaintiff based its motion on the agreement attached to its initial complaint. Regardless of the merits of the agreement addressed above, this delay precludes the granting of preliminary injunctive relief. See Tough Traveler, Ltd. v. Outbound Products, 60 F.3d 964, 968 (2d Cir. 1995). Plaintiff's "failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." See Citibank, N.A. v. Citytrust, 756 F.2d 273, 277 (2d Cir. 1985).

**Count II - Violation of the Connecticut Uniform Trade Secrets Act ("CUTSA")**

To qualify as a trade secret, the information at issue must: (1) be of the kind included in the nonexhaustive list contained in the statute; (2) be 'of independent economic value'; and (3) be the subject of reasonable efforts to maintain its secrecy. Dreamcatcher Software Development, LLC v. Pop Warner Little Scholars, Inc., 298 F. Supp 2d 276, 282 (D. Conn. 2004) (citing Elm City Cheese Co. v. Federico, 251 Conn. 59, 76 (1999)).

Defendants argue that there is no evidence that Schenk misappropriated any of Prezio's trade secret information. First, defendants contend that it is unclear exactly what information plaintiff is claiming actually constitutes a trade secret. Second, defendants assert that plaintiff cannot demonstrate a transfer of confidential information from Schenk to Spectrum. In other

9

words, defendants argue that even if trade secrets were located in Schenk's personal email account, they were not misappropriated. Third, defendants contend that plaintiff cannot demonstrate damages.

Customer lists and pricing information can constitute trade secrets as defined by statute. Conn. Gen. Stat. § 35-51(d); Milso Industries Corp. v. Nazzaro, 2012 WL 3778978, at *8 (D. Conn.). There are genuine issues of material fact as to whether content of Schenk's AOL emails are of independent value and as to whether plaintiff made reasonable efforts to maintain the secrecy of such information. Indeed, "[t]he question of whether ... a party has made reasonable efforts to maintain the secrecy of a purported trade secret is by nature a highly fact-specific inquiry." Federico, 251 Conn. at 80. Moreover, such efforts "need only be reasonable under the circumstances." Id. A reasonable jury could find that the files on Schenk's personal email account amounted to trade secrets.

Defendants focus their attack on plaintiff's inability to demonstrate that Schenk or Spectrum used information derived from Schenk's emails for "any business purpose whatsoever." Nevertheless, on January 11, 2016, Magistrate Judge Margolis ruled that defendants were responsible for the deletion of nearly half of the e-mails for which additional discovery had been ordered. Her previous ruling of September 2015 held that the metadata from these emails was relevant to the case. While leaving the exact parameters of an adverse inference to be determined, Judge Margolis held that defendants' actions were grossly deficient.

In their supplemental brief, defendants argue that plaintiff's adverse inference request is groundless and reflects a fundamental misunderstanding of metadata. Defendants assert that the missing metadata is not relevant. Nevertheless, drawing all inferences in favor of plaintiff, this is

a factual dispute, resolution of which is not appropriate at the summary judgment stage.

If appropriate based on plaintiff's offer of proof, adverse inference language will be crafted with the assistance of counsel at trial. Whether such inferences when matched with plaintiff's offer of proof amount to misappropriation is a material factual issue genuinely in dispute. Plaintiff will also be left to its proof as to whether Schenk's misappropriation caused plaintiff to lose accounts with DCM and Bon Secours. Assessment of credibility is essential in a case like this, where spoilation of evidence potentially prevents a plaintiff from equitably presenting its case. Accordingly, summary judgment will be denied as to Count II.

**Count III - Tortious Interference with Contractual Relations**

"A claim for tortious interference with contractual relations requires the plaintiff to establish (1) the existence of a contractual or beneficial relationship, (2) the defendants' knowledge of that relationship, (3) the defendants' intent to interfere with the relationship, (4) the interference was tortious, and (5) a loss suffered by the plaintiff that was caused by the defendants' tortious conduct." Landmark Inv. Group, LLC v. CALCO Const. and Development Co., 318 Conn. 847, 864 (2015).

Defendants argue that plaintiff cannot prevail on its tortious interference claim because Spectrum's interference was not tortious.

> [N]ot every act that disturbs a contract or business expectancy is actionable. For a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation ... or that the defendant acted maliciously. An action for intentional interference with business relations ... requires the plaintiff to plead and prove at least some improper motive or improper means.... A claim is made out only when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself.

Wiederlight, 208 Conn. at 535-36.

Plaintiff contends that during his July 2013 job interview with Spectrum, Schenk specifically admitted to having a non-compete agreement with plaintiff, but that Spectrum nevertheless hired Schenk.  This allegation amounts to mere interference, which the Connecticut Supreme Court held to be insufficient to establish tortious conduct.  Id at 536.  In Wiederlight, the Court concluded that "the assertion that IAC encouraged Wiederlight to sell commercial insurance in the restricted area when it knew or should have known of the covenant's terms does not fairly imply that IAC acted with fraud, misrepresentation, intimidation or molestation or that it acted with malice."  Id.

Plaintiff relies upon its allegations of damages in Section III(C) of its response to demonstrate tortious conduct.  See [Doc. # 75].  However, this Court has held that a plaintiff's allegations and evidence of damages stemming from a defendant's actions do not form the malice necessary to establish tortious conduct:

> [I]n response to the defendants' argument that the plaintiff has not produced evidence that interference with the Employment Agreements was tortious, the plaintiff argues that the defendants' conduct was tortious 'as they knew that the competing employment would immediately injure Milso by diverting existing accounts serviced by Nazzaro and Larkin from Milso to Liberty.' (Pl.'s Br. 43.) However such knowledge shows only that the defendants knew that they would be taking business away from Milso, which would be in the normal course because they were competing with Milso; such knowledge does not fairly imply that the defendants acted with fraud, misrepresentation, intimidation or molestation or that they acted with malice.

Nazzaro, 2012 WL 3778978, at *13.  Plaintiff has not demonstrated tortious conduct as defined by Connecticut precedent.  Accordingly, summary judgment will be granted as to Count III.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgement is GRANTED in part and DENIED in part. Counts I and III, breach of contract and tortious interference with contractual relations are dismissed; Count II, pursuant to CUTSA, remains.

Dated this 22nd day of March, 2016, at Bridgeport, Connecticut.

        /s/Warren W. Eginton
        WARREN W. EGINTON
        SENIOR UNITED STATES DISTRICT JUDGE